**Josef ESPINOSA, Plaintiff,**

v.

**GUARDIAN LIFE INSURANCE, Defendant.**

**Civ. A. No. 94–10547–RCL.**

United States District Court, D. Massachusetts.

July 7, 1994.

Bennett H. Klein, Gay & Lesbian Advocates & Defenders, William Garza, Boston, MA, for Plaintiff.

Joseph F. Ryan, Mary J. Ryan, Lyne, Woodworth & Evarts, Boston, MA, for defendant.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

The plaintiff, Josef Espinosa, filed this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et. seq.*, to enforce rights he claims to past and future group health insurance benefits under a health insurance plan issued and administered by the defendant, Guardian Life Insurance Company of America, Inc. ("Guardian"). Espinosa now moves for a preliminary injunction (1) to prohibit Guardian from failing or refusing to provide him full accident and health insurance benefits coverage under his employer's group accident and health insurance plan; (2) to prohibit Guardian from interfering with, refusing payment of claims under, or cancelling or rescinding, his accident and health insurance benefits; and (3) to require Guardian to take all administrative and other necessary steps to implement the injunction.

After careful review of all of the affidavits, exhibits and briefs submitted by the parties, and their oral argument on the motion, the Court concludes that Espinosa has failed to demonstrate that he is likely to succeed on the merits at trial.[1] Therefore, the Court will deny Espinosa's motion. As the First Circuit has said, however:

> ... [A] district court's conclusions at the preliminary injunction stage are only at-

---

1. The plaintiff must show the following in order for a preliminary injunction to issue:

(1) a likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) an outweighing of any harm which the injunction would inflict on the defendants; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Jackson v. Fair*, 846 F.2d 811 (1st Cir.1988). The First Circuit has regarded the showing of a likelihood of success as "critical in determining the propriety of injunctive relief." *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir.1985), *citing Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009–22 (1st Cir.1981). *See also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir.1991); *Public Service Co. v. West Newbury*, 835 F.2d 380, 383 (1st Cir.1987).

tempts to predict probable outcomes. Thus, 'a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial....'

Cohen v. Brown University, 991 F.2d 888, 902 (1st Cir.1993), quoting Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir.1991). Thus, whether Espinosa can regain what is lost to him on this motion is a question that must await a trial on the merits.

### I. Findings of Fact.

The findings which follow represent the Court's determination as to the "probable existence" of the facts detailed below. Foster–Miller, Inc. v. Babcock & Wilcox Canada, 848 F.Supp. 271, 273 (D.Mass.1994).

### A. Espinosa's Health History

Espinosa tested positive in 1987 for the antibody to the human immunodeficiency virus ("HIV"). A positive HIV test result indicates that a person has been exposed to HIV; it does not mean that a person has acquired immune deficiency syndrome ("AIDS") or that he or she is even ill. An HIV-positive person may remain in excellent health for as long as ten or eleven years after being infected with HIV. AIDS is a disease manifested by the presence of specific, defined opportunistic infections, e.g., Pneumocystis Carinii Pneumonia, Kaposi's Sarcoma, lymphoma, or toxoplasmosis.

At the time Espinosa received his HIV-positive result, he felt well and understood the test result to mean only that he had been exposed to the virus, and not that he was suffering from any illness. Espinosa continues to feel well, has not experienced any health problems, and has led a busy, active life.

In 1987, Espinosa was a restaurant owner and chef. He was responsible for every facet of the business, from cooking to finances, and typically worked 60–80 hours per week. In 1989, he sold the restaurant and started an interior decoration business. From September of 1991 to the present, Espinosa has worked at Restaurant Navona ("Navona"), where he is now General Manager. In addition, he has continued his design business. A typical work week for him comprises sixty hours.

Espinosa's medical care provider, Jerald Feuer, by affidavit states that at all times subsequent to receiving his HIV test result in 1987, Espinosa has been in excellent health. According to Feuer, Espinosa has not had any problems or symptoms related to HIV. He has never received any medication or treatment for any sort of HIV-related problem.

Beginning in November of 1989, Espinosa went for checkups with Feuer to monitor Espinosa's health status.[2] The dates of these checkups were: November 8, 1989; February 14, 1990; June 22, 1990; December 11, 1990; March 9, 1991; October 8, 1991; April 8, 1992. In his notes of Espinosa's December 11, 1990 visit with him, Feuer referred to Espinosa's "six month HIV check up." In his March 9, 1991, Feuer noted that "Josef is back today for his quarterly HIV" visit. Likewise, the October 8, 1991 visit referred to HIV. During these visits, Espinosa gave blood samples. Feuer also checked Espinosa's weight, temperature and blood pressure, and examined his ears, eyes, nose and throat, and listened to his lungs. The Court concludes that all the medical visits between November 8, 1989 and April 8, 1992 were primarily intended to determine whether Espinosa was experiencing any HIV-related problems, and to monitor his general health in light of the fact that he was HIV-positive.

The blood sample was drawn to test the count of Espinosa's CD4 cells. CD4 cell blood tests are used as a marker of a person's immune status. A count of 500 or more indicates that an individual is capable of living a normal, active life. A decline over time indicates the individual's likely inability to resist infections. Espinosa's CD4 cell test results were as follows: November 8, 1989— 563; February 14, 1990—556; June 18, 1990—638; December 11, 1990—524; March 14, 1991—468; October 8, 1991—516. According to Feuer, these CD4 cell counts "are not normal in the sense that they would be

---

2. Espinosa has submitted his medical records as an exhibit to Feuer's affidavit.

higher absent the presence of HIV infection." They are, however, consistently in a range in which HIV-positive persons are likely to stay healthy and free of infections or other symptoms.

Espinosa has suffered from fatigue, but Feuer states that the fatigue is the result of excessive work—not of HIV.

### B. *The Insurance Application.*

After becoming a full-time employee of Navona, Espinosa filled out an application for Navona's group health insurance, issued and administered by Guardian. Espinosa completed the application on March 27, 1992.

The questions relevant to this action were 16 and 17. Question 16 asked whether Espinosa had

ever been treated for or ever had any known indication of heart disorder, high blood pressure, diabetes, rheumatic fever, stroke, stomach or intestinal trouble, genito-urinary disorder, cancer, tumor, injury to or pain or disorder of the back or neck, arthritis, chest pain, asthma, allergies, or respiratory illness, mental or nervous disorder?

Espinosa checked "no." Question 17 asked whether Espinosa had, "in the past five years (a) consulted or been examined by or treated by a physician, practitioner or specialist." Espinosa checked "yes." He was asked if, in the past five years, he had "(b) been in a hospital, sanitarium, or other institution for observation, diagnosis, treatment or an operation." Espinosa checked "no." He was asked whether, in the past five years, he had "been prescribed medication(s)." He checked "no."

The application asked that "for each 'Yes' answer," the applicant "give details." The following information was given in response to the following items: Below "Ques. No." was written "17." Below "Name of Person" was written "Josef." Below "Medical Practitioner's Name and Address" was written "Jerry Fauer (sic) 16 Haviland St. Boston, MA." Under "Name and Address of Hospital," there was an arrow pointing to the address he had written under the previous blank. Espinosa left the space under "Con-

dition" blank. Under "Duration of Symptoms, Treatment & Degree of Recovery," was written "Physicals." Under "Dates" was written "1/year."

In the text before Espinosa's signature, was written, among other things:

I hereby represent that the statements and answers to the questions are to the best of my knowledge and belief, full, complete and true. I understand that they shall form the basis upon which I may be included for insurance under the group plan.

Espinosa also signed a medical authorization, allowing his medical providers to release his medical records to Guardian.

In a supplement to the application, filled out on April 13, 1992, Espinosa was asked the date of his last physical examination. He wrote October 8, 1991. In fact, his last exam was April 8, 1992. He was asked what the results of the examination were. He wrote "ok." He was asked if any advice had been given. He wrote "no." He was asked if any medication had been prescribed. He wrote "no."

On April 21, 1992, Guardian approved Espinosa's application for health, life and accidental death and disability insurance, effective April 15, 1992 through Navona's group plan. By letter dated December 30, 1992, Guardian denied a pending benefits claim and rescinded and cancelled all of Espinosa's coverage. The letter stated that Espinosa had failed to disclose a "prior history of abnormal laboratory studies including treatments and consultations rendered at Fenway." Espinosa has been without health insurance since December of 1992.

### II. *Law*

### A. *Applicable Law.*

ERISA provides that a participant in an employee benefit plan may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA authorizes injunctive relief to "enjoin any act or practice which violates ... the terms of the

plan, or ... to enforce ... the terms of the plan." 29 U.S.C. § 1132(a)(3).

■ Generally, an insurance plan which is regulated by ERISA is interpreted under federal law. *Wickman v. Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir.1990); *Pizzuti v. Polaroid Corp.*, 985 F.2d 13, 14 (1st Cir.1993); *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989).

Several cases have specifically applied federal law to cases involving attempts by insurers to rescind insurance policies on the basis of misrepresentations by the applicant. *See Tingle v. Pacific Mutual Ins. Co.*, 996 F.2d 105 (5th Cir.1993); *Guardian Life Ins. v. Watychowicz*, 1992 WL 221321 (N.D.Ill.1992); *Negoski v. Country Life Ins. Co.*, 843 F.Supp. 372 (N.D.Ill.1993); *Martin v. Pate*, 749 F.Supp. 242 (S.D.Ala.1990).

Guardian, literally as an aside in its oral argument and with no discussion of the law, other than a brief mention of ERISA's savings clause, claimed that Massachusetts law applies to Espinosa's claim. In its memorandum in opposition to Espinosa's motion, Guardian cited Massachusetts law, but did not discuss at all why Massachusetts law should apply.

The Supreme Court has discussed the "statutory complexity" of ERISA's preemption provisions, which, in its words, "perhaps are not a model of legislative drafting." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 47, 107 S.Ct. 1549, 1552, 1553, 95 L.Ed.2d 39 (1987), *quoting Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985). The First Circuit has suggested in dictum that "a state law defense of fraud in the inducement relating to the *formation* of the putative ERISA plan" will not be preempted by ERISA. *Nash v. Trustees of Boston University*, 946 F.2d 960, 964, n. 8 (1st Cir.1991). In a parenthetical to the citation of the Supreme Court's decision in the *Pilot Life* case, the First Circuit noted that ERISA does preempt a claim of "fraud in the inducement arising from improper processing of a *claim*

under a plan." *Nash*, 946 F.2d at 964, n. 8, *citing Pilot Life*, 481 U.S. at 41, 107 S.Ct. 1549.

■ Given Guardian's failure to brief the issue of whether ERISA preempts Massachusetts law, and given the authority to the effect that ERISA does preempt claims that an applicant misrepresented his health status on the application form, the Court, for the purposes of this preliminary injunction, will apply federal law.[3]

■ A fraudulent misrepresentation by the applicant in an insurance application is grounds for rescission of the insurance policy. *See Nash*, 946 F.2d at 965–967 (fraud in the inducement defense governed by federal law). In the development of federal common law, federal courts may look to state law for guidance. *Nash*, 946 F.2d at 967, *citing Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Regarding fraud in the inducement, the First Circuit has spoken approvingly of the Massachusetts' courts' adoption of the "widely-accepted model" set forth in Restatement (Second) of Contracts § 164 (1979): "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." *Nash*, 946 F.2d at 967. *See also Tingle v. Pacific Mutual Insurance Co.*, 837 F.Supp. 191, 193 (W.D.La.1993).

Guardian contends that a good faith misrepresentation which increases the insurer's risk is independent grounds for rescission. In other words, Guardian argues that, even if Espinosa made a misrepresentation with no fraudulent intent, the insurer can rescind the policy if the misrepresentation had the effect of increasing the insurer's ultimate risk. Espinosa responds that language contained in the application may modify the law governing misrepresentations. Rather than citing to cases holding that a good faith misrepresentation is insufficient in and of itself to void an insurance policy, *see, e.g., Adams v. John*

---

**3.** As this case proceeds, Guardian will have an opportunity to address the preemption issue if it sees fit.

*Hancock Mut. Life Ins. Co.*, 797 F.Supp. 563, 566 (W.D.Tex.1992), Espinosa argues that the insurance application itself requires the applicant to use a subjective standard in answering the questions it poses. That is the significance, Espinosa argues, of the statement preceding the signature line of the application: "I hereby represent that the statements and answers to the questions are *to the best of my knowledge and belief,* full complete and true." (Emphasis added).

 It is possible that federal law permits rescission based on an objective standard, that is, a standard which allows rescission on the basis of an unintentional, non-fraudulent misrepresentation. But once an insurer has entered into a policy by using an application form more favorable to the insured than the law provides, it may not rely on a rule of law which is more stringent than the application form. *William Penn Life Ins. Co. of New York v. Sands,* 912 F.2d 1359, 1362–64 (11th Cir.1990); *Skinner v. Aetna Life & Casualty,* 804 F.2d 148, 150 (D.C.Cir.1986). Inclusion of the "knowledge and belief" qualification shifts the focus "from an inquiry into whether the facts asserted were true to whether, on the basis of what he knew, the applicant believed them to be true. Thus [the applicant's] answer must be assessed in the light of his actual knowledge and belief." *Skinner,* 804 F.2d at 150. *Sands,* 912 F.2d at 1363. In this way, the intentions of the parties, including the understanding of the insured, may be effectuated.

 But Espinosa, too, is bound by the language of the application. Espinosa asserted in the application not only that his answers were "true," but that they were also

"full" and "complete." Espinosa also acknowledged in the application that he understood that his answers would "form the basis upon which I may be included for insurance under the group plan."

The Court, in sum, will look at the facts from the point of view of Espinosa's actual knowledge and belief. It will also take into account Espinosa's attestation that his answers were "true, full and complete."

B. *Was there a Knowing Misrepresentation?*

 Espinosa argues that Guardian simply did not ask the right question. Espinosa was never asked whether he had tested positive for HIV. Rather, he was asked whether he had any indications of other specific illnesses, to which Espinosa apparently truthfully answered "no." Espinosa was then asked for what "condition" he had been treated, and he left this blank, stating only "physicals" with respect to the duration of symptoms, treatment and degree of recovery. In answer to the supplemental questions, Espinosa was asked the date and result of his last medical examination. He stated that the examination had taken place on October 8, 1991, and that the result was "ok".[4]

Viewed in context, Espinosa has not demonstrated that he is likely to prevail on his claim that his answers were "full, complete and true."[5]

With respect to his amplification of question 17 on the application, Espinosa was asked to give "details." But Espinosa did not give full and complete details. Instead, he left the space under "condition" blank.

4. Espinosa completed the answers to the supplement on April 13, 1992. His last examination immediately preceding this date occurred on April 8, 1992. Espinosa states that he wrote "October 8, 1991" rather than the more recent date because he thought the supplement was only asking for information with respect to the original application, which was dated March 27, 1992. The Court concludes that there is some ambiguity in the request for the date of his latest examination. The application asked Espinosa to "[u]se this space to amplify and extend answers to questions in your application dated 3/27/92." Strictly construing the application and supplement against Guardian, *see Friez v. National Old Line Ins. Co.,* 703 F.2d 1093, 1094 (9th Cir.1983), the Court concludes that Espinosa's writing October 8, 1991, rather than the more recent visit, is not a misrepresentation which would warrant rescission.

5. The Court recognizes that Guardian will have the burden of proof at trial on its defense that the policy it issued was induced by a misrepresentation. At the preliminary injunction stage, the Court must determine the likely outcome at trial, and it concludes that Guardian is likely to prevail on its defense. Nothing in this opinion should be taken to suggest that Espinosa has the burden of proof on the question of misrepresentation.

He argues that the word "condition" is ambiguous, and that any ambiguity must be construed against the insurer. Specifically, he argues that the word "condition," when followed, as it was on the application form, by the phrase "duration of symptoms, treatment & degree of recovery," reasonably can be interpreted to mean that the question seeks to discover particular illnesses with particular symptoms. Because HIV-positivity is not an illness in and of itself, and as it has no symptoms in and of itself, there was no misrepresentation in leaving blank the space under "condition," Espinosa contends.

■ The Court agrees that ambiguities in the application are to be construed against the insurer. See *Friez v. National Old Line Ins. Co.*, 703 F.2d 1093, 1094 (9th Cir.1983); *Hammer v. Investors Life Ins. Co.*, 511 N.W.2d 6 (Minn.1994). The Court agrees also that there may have been some ambiguity in the use of the word "condition." But Espinosa did not merely leave the space under "condition" blank. He also made an affirmative statement, which was incomplete. He wrote "physicals" under the column calling for "duration of symptoms, treatment & degree of recovery." Espinosa knew that these "physicals" were, as his medical provider phrased it, "HIV check-ups." He also knew that if the insurer knew the true purpose of these office visits, it would refuse to give him insurance.[6] Espinosa has not met his burden of showing that he will probably prevail on his claim that his unadorned disclosure of "physicals" is not, in the context of this application, a knowing misrepresentation. It is not "detailed," not "full" and not "complete."

■ Next, when asked for "dates," Espinosa wrote "1/year." Espinosa has failed to meet his burden of showing that this likely was a true statement, and he has failed to meet his burden of showing that he probably did not know the statement was untrue. He had visited his medical provider twice in the previous year, and three times in the year before that. His medical provider had referred to the visits as "*six-month* HIV check-

ups." (Emphasis added) An inference can be drawn that Espinosa deliberately failed to disclose the actual frequency of his visits, because he knew that Guardian would become suspicious and ultimately refuse to give him insurance. And he probably was right. Guardian sent a follow-up supplement solely because of the disclosure of once-a-year physicals. It would likely have wanted even more information if it had been told that Espinosa had been to a medical provider more than once a year; further inquiries would likely have led Guardian to discover Espinosa's HIV-positive status.

■ When Espinosa received the follow-up supplement, he knew, from the very fact that it was sent, that Guardian wanted detailed and complete answers to its questions. In addition, above Espinosa's signature was the statement: "I represent that the answers as amplified and extended above are true and complete to the best of my knowledge and belief. . . ."

The Court concludes that Espinosa has failed to meet his burden of showing that he is likely to prevail in showing that the answer "ok" to the question in the supplement, "what were the results of the examination," was not a knowing misrepresentation. The records of Espinosa's medical care provider indicate that the counts for Espinosa's CD4 cells were not "normal," even though they were in a range in which Espinosa was likely not to get other infections. For an individual who was HIV-positive, then, Espinosa was "ok." If he had been asked on the street by a friend how he was feeling, he could have honestly answered "ok." But in a supplement following up answers given in an insurance application, in a supplement in which Espinosa stated that his answers were "complete," "ok" simply is not good enough.

■ In the context in which the questions and answers appear, Espinosa's responses, at least for the purposes of this preliminary injunction motion, constitute material knowing misrepresentations. In addition, even if there were any doubt as to each individual

---

6. Espinosa's attorney conceded at the hearing on this motion that Espinosa knew that Guardian would have wanted to know that he was HIV-

positive, and that had Guardian known this information it likely would not have provided insurance coverage to Espinosa.

response discussed above, the cumulative effect of the answers leads the Court to conclude, for the purposes of this motion, that there was a pattern evincing an intention to mislead. Espinosa knew exactly what Guardian was looking for, and he gave incomplete answers in an effort to prevent Guardian from discovering the truth. There thus appear to have been grounds for rescission of the policy.

■ Espinosa relies on *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 809 P.2d 533, 537 (1991). In that case, the applicant had tested HIV-positive, but had not developed AIDS. The court ruled that the applicant was not required to volunteer the fact that he was HIV-positive to the insurer, and that the policy should not be rescinded based on the failure to disclose his HIV status. Misrepresentation cases necessarily are fact-dependent. In *Waxse,* the applicant was asked questions which were different from those in this case, and consequently the applicant did not respond as Espinosa did here. In addition, in *Waxse,* there is no indication that the applicant was asked to verify that his answers were "full and complete." In the case at bar, the Court has not concluded that there is an affirmative obligation to disclose HIV-positivity on every insurance application form. But with respect to the insurance application at issue here, Espinosa was required, to give "full, complete, truthful and detailed" answers. This he failed to do, based on the evidence now before the Court.

Accordingly, the Court finds that Espinosa has not demonstrated that there is a likelihood of his success on the merits. The Court need go no further into the inquiry as to whether the preliminary injunction Espinosa seeks is appropriate. It is not, and the motion by which it is sought is denied.

SO ORDERED.